# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LONDON DESHANN HARRIS,

        Defendant-Appellant.

UNPUBLISHED
April 14, 2016

No.  324987
Wayne Circuit Court
LC No.  14-005108-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAWYNE MATTEWS ANDREWS,

        Defendant-Appellant.

No.  325356
Wayne Circuit Court
LC No.  14-005108-FC

---

Before:  O'CONNELL, P.J., AND MARKEY AND O'BRIEN, JJ.

PER CURIAM.

Defendants London Deshann Harris and Dawyne Mattews Andrews were tried jointly but before separate juries.  Harris was convicted of first-degree felony murder, MCL 750.316(1)(b), and Andrews was convicted of first-degree felony murder, armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.  The trial court sentenced Harris to life imprisonment for his felony-murder murder conviction. Andrews received concurrent terms of life in prison for the felony-murder conviction and 18 to 40 years for the armed robbery conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction.  Harris appeals by right in Docket No. 324987, and Andrews appeals by right in Docket No. 325356.  We affirm in both appeals.

Defendants' convictions arise from the April 30, 2014, shooting death of Marquise Moncrief, who was fatally shot during a robbery at a drug house on Keating Street in Detroit. The prosecutor's theory at trial was that Harris aided and abetted Andrews and a third co-perpetrator, Timothy Brown, by using his status as a regular customer at the house to enable

-1-

Andrews and Brown to gain access to the house. All three of them then acted in concert to rob Moncrief, who was carrying a large amount of cash, and to steal marijuana.

Deon Alexander, the owner of the house, and Anthony Johnson, who was working at the house on the night of the offense, both testified at trial. Johnson testified that the house only sold marijuana to regular customers. Johnson denied knowing Andrews and Brown, but said they arrived with Harris, a regular customer, so Johnson agreed to sell them marijuana. After the men entered the house, Johnson heard a gunshot. He saw that Andrews had shot Moncrief in the head, and then he removed money from Moncrief's pockets. According to Johnson, both Andrews and Brown were armed with guns. According to Alexander, defendant Harris and one of the other men both issued instructions for the occupants of the house to get down and not move. After the robbery, Harris, Andrews, and Brown all fled from the house together.

## I. DOCKET NO. NO. 324987

### A. PROSECUTORIAL MISCONDUCT

Defendant Harris raises several claims of prosecutorial misconduct. Harris failed to preserve these claims with a timely objection in the trial court. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Therefore our review is limited to plain error affecting Harris's substantial rights. *Id.* Harris also raises a related claim of ineffective assistance of counsel, arguing that defense counsel was ineffective for failing to object to the prosecutor's challenged remarks. Because Harris did not raise that claim in a motion for a new trial or request for a *Ginther*[1] hearing, our review of that issue is limited to mistakes apparent from the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

"[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *Bennett*, 290 Mich App at 475. Generally, prosecutors have great latitude with respect to their arguments and conduct. *People v Bosca*, 310 Mich App 1, 34; 871 NW2d 307 (2015). "The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546 (2007).

### 1. DENIGRATION OF DEFENSE COUNSEL

Harris first argues that the prosecutor improperly denigrated defense counsel in the eyes of the jury by accusing him of distracting the jury with the "nonissue" of whether the physical evidence of the shooting was consistent with the close-range shooting Johnson described in his testimony. A prosecutor may not personally attack the credibility of defense counsel or suggest that defense counsel is intentionally attempting to mislead the jury. Attacks on defense counsel's credibility undermine the defendant's presumption of innocence by implying to the jury that defense counsel does not believe his own client. *People v Dalessandro*, 165 Mich App 569, 580; 419 NW2d 609 (1988).

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

The prosecutor's remarks did not clearly exceed the bounds of acceptable argument. Harris's counsel cross-examined the medical examiner and firearms expert regarding stippling and other evidence of close-range firing with the apparent purpose of establishing discrepancies between the physical evidence and the prosecutor's theory of how the shooting occurred. In closing argument, defense counsel argued that the evidence disproved the prosecutor's evidence regarding the shooter's position in relation to Moncrief inside the house. Counsel suggested that Moncrief was not killed during a robbery, but rather was targeted by an assassin. The prosecutor's theory was that Harris was guilty of felony murder under an aiding and abetting theory because he acted in concert with Andrews and Tim Brown to rob the occupants of the drug house, and Moncrief was murdered during the robbery. It was not unreasonable for the prosecutor to argue that Harris's counsel's emphasis on the specific physical circumstances was immaterial to the prosecution's theory and that the absence of stippling was not inconsistent with Johnson's testimony. The prosecutor's use of the words "nonissue" and "distraction" did not push the argument past the boundaries of acceptable argument into a personal attack on defense counsel's character. Accordingly, there was no plain error.

## 2. DENIGRATION OF DEFENDANT'S CHARACTER

Harris next argues that the prosecutor improperly denigrated defendant by referring to him as a "coward" and accusing him of "weaseling behavior." "It is not proper for the prosecutor to comment on the defendant's character when his character is not in issue." *People v Quinn*, 194 Mich App 250, 253; 486 NW2d 139 (1992). In this case, the prosecutor's remarks were not an ad hominem attack on Harris's character; they were part of an argument explaining why Harris's defense of mere presence was not credible because he repeatedly tried to evade responsibility for his conduct. The prosecutor's use of the terms "coward" and "weaseling" does not elevate the prosecutor's argument to plain error because a prosecutor is not required to confine argument to the blandest possible terms, *Dobek*, 274 Mich App at 66, and because the references were brief and were made during an otherwise proper argument that focused on the evidence.

## 3. DENIGRATION OF TYESHIA PROFIT

Harris further complains that the prosecutor also improperly denigrated witness Tyeshia Profit. Profit, who was Harris's domestic partner, testified that she was with Harris when Harris visited the drug house. She claimed, however, that she waited outside in a car while Harris went inside the house. Profit testified that she saw two other persons enter the house at the same time Harris did, but she denied that the other persons were with Harris. The prosecutor extensively attacked Profit's credibility using recorded telephone conversations between Harris and Profit, which were made while Harris was incarcerated and awaiting trial. In closing argument, the prosecutor argued that Profit was not credible and remarked that it was "despicable" and "disgusting" that Profit lied to help Harris escape conviction.

A prosecutor is permitted to argue from the facts that a witness is not credible or worthy of belief. *Dobek*, 274 Mich App at 67. Defendant's reliance on *Hodge v Hurley*, 426 F3d 368, 378 (CA 6, 2005), to argue that the prosecutor's remarks were improper is misplaced because the prosecutor did not suggest that she had some personal knowledge not presented to the jury that Profit was untruthful. Rather, the prosecutor argued from the evidence that Profit was not a

credible witness. Further, the prosecutor's use of the harsh terms "despicable" and "disgusting" does not render the otherwise proper argument improper. *Dobek*, 274 Mich App at 66. The remarks do not rise to a level of plain error.

## 4. APPEAL TO JURORS' SYMPATHY AND CIVIC DUTY

Harris also argues that the prosecutor improperly urged the jury to convict him as part of its civic duty. "[I]t is improper for a prosecutor to appeal to the jury's civic duty by injecting issues broader than guilt or innocence or encouraging jurors to suspend their powers of judgment." *People v Thomas*, 260 Mich App 450, 455-456; 678 NW2d 631 (2004). Similarly, the prosecutor may not "seek the jury's sympathy for the victim." *Dobek*, 274 Mich App at 80.

In the instant case, the prosecutor's general statement about the value of jury duty did not encourage the jurors to suspend their powers of judgment or to convict Harris out of a sense of duty or sympathy for Moncrief's family. The prosecutor's statement about "justice for Marquise" came at the conclusion of a lengthy argument explaining how the evidence proved Harris's guilt. This was not a plea for justice regardless of the evidence. It is an argument that justice would be served by convicting Harris because the evidence proved his guilt. The prosecutor simply and plainly stated that the family should have justice and did not appeal to the jury's emotions in the dramatic manner of the prosecutor in *Dalessandro*. And, in contrast to *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008), the prosecutor did not imply that Moncrief's family was "re-victimized" by the proceedings. Similar to *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014), the prosecutor's argument for justice was integrated into an argument that the evidence proved Harris's guilt. Accordingly, there was no plain error.

## 5. INEFFECTIVE ASSISTANCE OF COUNSEL

Harris argues that defense counsel was ineffective for failing to object to the prosecutor's remarks discussed above. To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different. *Jordan*, 275 Mich App at 667. Because we have concluded that the prosecutor's remarks were not improper, defendant's ineffective assistance of counsel claim cannot succeed. Counsel is not ineffective for failing to make a meritless objection. *Unger*, 278 Mich App at 255-256.

## B. MOTION FOR MISTRIAL

Harris next argues that the trial court erred in denying his motion for a mistrial after the court rebuked defense counsel for instructing a witness to stop talking while counsel was objecting. "We review for an abuse of discretion a trial court's decision regarding a motion for a mistrial." *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). "This Court will find an abuse of discretion if the trial court chose an outcome that is outside the range of principled outcomes." *Id.*

A trial court should grant a mistrial only when an error is so prejudicial that the defendant's right to fair trial is impaired. *Id.* Harris argues that his ability to obtain a fair trial

was impaired by the trial court's comments after he objected during Profit's testimony because the comments pierced the veil of judicial impartiality. We disagree.

In *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015), our Supreme Court clarified the proper analysis under which a claim of judicial misconduct is to be reviewed:

> A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party.

Judicial misconduct includes the belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to one side, or biased commentary in front of the jury. *Id.* at 172-173.

In this case, the challenged conduct involved an isolated rebuke during trial. A single inappropriate act generally will not give the appearance of advocacy or partiality unless it is egregious. *Id.* at 171. In this instance, however, the trial court legitimately intervened when Harris's counsel attempted to usurp the trial court's authority by chastising a witness. It is the court's responsibility to exercise reasonable control over the mode and order of interrogation, and to protect witnesses from harassment or undue embarrassment. MRE 611(a). Moreover, the court's conduct during the rebuke did not convey any views concerning the weight or strength of any of the parties' theories, arguments, or evidence in the case, but rather it was directed at clarifying the attorneys' and the court's respective roles in the conduct of the proceedings after an objection. Thus, under the totality of the circumstances, the trial court's comments were not reasonably likely to create an appearance of advocacy or partiality for or against a party. Therefore, the trial court's conduct did not pierce the veil of judicial impartiality, and accordingly, the trial court did not abuse its discretion in denying Harris's motion for a mistrial.

## C. SUFFICIENCY OF THE EVIDENCE

Harris argues that the evidence was insufficient to support his felony-murder conviction because the evidence failed to establish his participation in the robbery of the drug house, which served as the predicate felony for the felony-murder charge. We disagree.

"In reviewing a claim of insufficient evidence, we view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have concluded that the elements of the offense were proven beyond a reasonable doubt." *Unger*, 278 Mich App at 222. We resolve all conflicts in the evidence in favor of the prosecution and will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses. *Id.* Circumstantial evidence and reasonable inferences arising from the evidence can constitute satisfactory proof of the elements of a crime. *Bennett*, 290 Mich App at 472. A defendant's state of mind with respect to knowledge and intent may be inferred from minimal circumstantial evidence. *Bosca*, 310 Mich App at 16.

-5-

The elements of first-degree felony murder were stated in *People v Smith*, 478 Mich 292, 318-319; 733 NW2d 351 (2007):

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (i.e., malice), (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b) . . . . [Citation, quotation marks, and brackets omitted.]

Armed robbery was the predicate felony supporting Harris's first-degree felony-murder charge. To establish the elements of armed robbery, the prosecutor must prove that

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers,* 277 Mich App 1, 7, 742 NW2d 610 (2007).]

To prove a defendant's guilt of felony murder under an aiding and abetting theory, the prosecutor must establish that the defendant:

> (1) performed acts or gave encouragement that assisted in the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony. [*People v Riley (After Remand)*, 468 Mich 135, 140; 659 NW2d 611 (2003).]

A defendant is guilty of aiding and abetting a felony murder when he has the requisite malice, which need not be identical to the principal's. *People v Robinson*, 475 Mich 1, 14; 715 NW2d 44 (2006). To prove malice required by *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980),

> the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with 'wanton and willful disregard' sufficient to support a finding of malice. [*Riley*, 468 Mich at 140-141.]

A jury may infer malice necessary for a felony-murder conviction "from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm" or "from the use of a deadly weapon." *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999).

Under the "natural and probable consequences" theory, an aider and abettor is criminally responsible for anything that is fairly within the common enterprise such that one might anticipate its commission should the opportunity arise. *Robinson,* 475 Mich at 9-13. "[A] natural and probable consequence of a plan to assault someone is that one of the actors may well escalate the assault into a murder." *Id*. at 11.

The prosecution presented evidence that Harris and Andrews were cousins who resided in the same home in 2008. Johnson testified that Harris was with two other men, whom Johnson later identified in photographs as Andrews and Brown, when Harris came to the house after midnight. Johnson and Alexander both testified that the drug dealers at the Keating house would not admit anyone they did not know, and that Harris was a regular customer at the house. Johnson, who was working the house on the night of the offense, testified that he did not recognize the two persons who were with Harris. This evidence supports an inference that Harris knew that Andrews and Brown could not gain access to the house on their own, and that Harris aided and abetted Andrews and Brown by accompanying them to the drug house to enable them to gain access to the house.

The events following Harris's admission to the drug house further support that the three men entered the house with a common intent to rob the occupants. After the men entered the house, Harris did not follow Brown's order to get down. Alexander was certain that Harris was one of the men who told the other occupants to get down and not move. Andrews's mother testified that Moncrief was carrying $1,000 in cash to pay a deposit on an apartment. After entering the house, Andrews shot Moncrief and then searched Moncrief's pockets. Moncrief's money was missing after the offense. After the robbery, Harris ran with Brown and Andrews as they fled the house.

The prosecution also presented evidence that Harris had a motive to rob because he had no funds in his bank account, and his bondsman was threatening to revoke his bond if he did not make a scheduled bond payment. Harris made the payment approximately five hours after the robbery. Although Profit testified that Harris's SSI payment would have been deposited at midnight on the evening of April 29 and 30, Harris's bank records indicated that the deposit was made the next day, after the bond payment was made.

Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that Harris was acting in concert with Andrews and Brown, knew that they were carrying firearms, and aided and abetted them in committing the robbery by providing them with access to the house and by assisting them in detaining the occupants inside the house during the robbery. Harris's participation in the offense, knowing that his co-perpetrators were carrying firearms, was sufficient to enable the jury to find the requisite malice for felony murder, because a shooting is a natural and probable consequence that may arise from the armed robbery of a drug house. *Robinson*, 475 Mich at 9-13.

## D. TRIAL COURT'S CONDUCT OF JURY VOIR DIRE

Harris argues that the trial court's decision to conduct jury voir dire itself, without allowing questions from the attorneys, violated his right to a fair trial. Harris did not object to the trial court's jury voir dire or request the court to inquire into any specific subjects during voir

dire; therefore, this issue is unpreserved and our review is limited to plain error affecting Harris's substantial rights. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012); *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011).

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *People v Tyburski*, 445 Mich 606, 618; 518 NW2d 441 (1994). "The scope of voir dire examination of prospective jurors is within the discretion of the court." MCR 6.412(C)(1). Voir dire "should be conducted for the purposes of discovering grounds for challenges for cause and of gaining knowledge to facilitate an intelligent exercise of peremptory challenges." *Id.* Although voir dire is the defendant's safeguard for ensuring an impartial jury, a defendant does not have the right to have his attorney conduct voir dire, or to have the trial court ask questions submitted by his attorney. *Tyburski*, 445 Mich at 619. "The court may conduct the examination of prospective jurors or permit the lawyers to do so." MCR 6.412(C)(2). "If the court conducts the examination, it may permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask." *Id*. Trial courts have wide discretion when conducting voir dire, and what is acceptable practice is not governed by hard and fast rules. *Tyburski*, 445 Mich at 623. On appeal, "this Court must determine whether the trial court conducted a voir dire 'sufficiently probing . . . to uncover potential juror bias.' " *People v Sawyer*, 215 Mich App 183, 187; 545 NW2d 6 (1996), quoting *Tyburski*, 445 Mich at 609.

In this case, the trial court's voir dire included examination into the jurors' personal beliefs, situations, and experiences. The court also addressed circumstances pertinent to this particular case and queried them about any possible philosophical or ideological disagreement they might harbor with the presumption of innocence and the prosecutor's burden of proving the defendant's guilt beyond a reasonable doubt. The court also asked the jurors about their own experiences, including whether they had been the victim of a crime, whether they or anyone close to them had been charged with or convicted of any crime, and whether they or any associates had any experience in positions related to law enforcement. The court also explained the concept of aiding and abetting theory, and it asked if anyone was unable to agree with the concept that a person who encourages or aids another person in the commission of the crime is as guilty as the person who committed the act. Although Harris argues that the jurors might have been biased because of their beliefs about drug dealing, witnesses' credibility, and perpetrators "snitching" against their co-perpetrators, we note nothing in the record that defense counsel asked the trial court to explore these specific subjects during voir dire. Moreover, the trial court's general questions about the jurors' willingness and ability to decide the facts and assess the witnesses' credibility based on the evidence presented, and not on the basis of their past experiences and beliefs about criminal activity, were sufficient to delve into juror bias. The trial court's voir dire was sufficiently probing to allow the parties to discover grounds for challenges for cause and to provide them with knowledge to facilitate intelligent exercise of peremptory challenges. Harris has not met his burden of establishing a plain error affecting his substantial rights.

Harris also claims ineffective assistance of counsel arising from counsel's failure to object to the trial court's decision to conduct voir dire by itself. Because the scope of voir dire is within the trial court's discretion and a defendant does not have the right to have his attorney conduct voir dire, trial counsel did not commit an objectively unreasonable error by failing to object to the trial court's decision to conduct voir dire. *Jordan*, 275 Mich App at 667.

## II. DOCKET NO. 325356

### A. PEREMPTORY CHALLENGES

Defendant Andrews argues that the trial court violated his right to fully exercise his peremptory challenges. Andrews preserved this issue by objecting to the trial court's ruling that neither party would be allowed to exercise a peremptory challenge to excuse any member of the jury other than a new juror who replaced Juror No. 8.[2]

A defendant's right to peremptory challenges is governed by statute, MCL 768.13, and court rule, MCR 6.412. The trial court's application and interpretation of a statute or court rule is reviewed de novo. *People v Lee*, 489 Mich 289, 295; 803 NW2d 165 (2011).

In the course of jury selection for Andrews's jury, 14 jurors were eventually seated, and both attorneys stated that they had no objections for cause, and both declined to exercise any peremptory challenges. However, the trial court delayed swearing a jury in order to inquire into a situation involving Juror No. 8. The trial court ultimately excused Juror No. 8 for cause for reasons not relevant to this appeal. After doing so, the trial court stated:

> The People by my calculation have six more peremptory challenges. The defense has four more. And we have, I think, only five [prospective] jurors left.
>
> So in my view you should be allowed to exercise our remaining peremptory challenges only as to juror number eight because you've all subsequently, you've all passed on the whole jury.
>
> * * *
>
> And if you don't agree to that, I'm just going with a jury of 13, and I'm ending it right now.

Both attorneys disagreed with the trial court's proposal. Andrews's counsel explained:

---

[2] The prosecutor argues that Andrews waived any error by affirmatively agreeing with the trial court's decision to proceed to trial with one less alternate juror. A waiver is "the intentional relinquishment or abandonment of a known right," and is different from a forfeiture, which involves the "failure to make the timely assertion of a right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id.* (citation and quotation marks omitted). Andrews did not affirmatively approve the trial court's plan to restrict peremptory challenges if Juror No. 8 were replaced. He affirmatively objected to that plan. Andrews approved the alternative plan to proceed to trial with only one alternate juror after the trial court overruled Andrews's objection. Under these circumstances, Andrews's approval of the alternative plan did not constitute a waiver of his objection to the prior ruling.

[W]hen I pick a jury or when I have one picked for me by the courts, I look at the interaction even in terms of body language and everything among all the jurors. So when you take – when one comes out and another one comes in, that to me changes the whole dynamics.

Instead of seating a new juror to replace Juror No. 8, the trial court stated, "[T]hen we're just gonna go with a 13 person jury."

Peremptory challenges may be exercised at any time before the swearing of the jury. "A 'pass' is not counted as a challenge but is a waiver of further challenge to the panel as constituted at that time." MCR 2.511(E)(3)(b). MCR 2.511(G) provides:

> After the jurors have been seated in the jurors' box and a challenge for cause is sustained or a peremptory challenge or challenges exercised, another juror or other jurors must be selected and examined. Such jurors are subject to challenge as are previously seated jurors.

In *People v Schmitz*, 231 Mich App 521, 529-530; 586 NW2d 766 (1998) (citations omitted), this Court, construing then MCR 2.511(F) (current MCR 2.511(G)), stated:

> The plain language of this rule is clear. If the composition of the panel is changed after a party passes a panel (either by challenges for cause or the exercise of peremptory challenge by another party), the party is free to exercise further peremptory challenges to any member of the new panel. Any other interpretation would ignore the phrase "as constituted at that time" and violate the principle that every word in a court rule should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible. . . . It is not until both parties pass for peremptory challenges, and there has been no change in the makeup of the panel, that the party's pass may be deemed conclusive. Accordingly, we hold that the trial court erred in equating a pass of the panel as an acceptance of each venireman thereon. [Citations omitted.]

The Court further held that a violation of this rule was not subject to harmless-error analysis because "subject[ing] this issue to harmless-error analysis would be to require this Court to do the impossible." *Id.* at 531.

Applying *Schmitz* to the instant case, we conclude that the trial court erred when it ruled that neither party would be permitted to use a peremptory challenge to excuse any member of the newly composed panel that would have been formed if Juror No. 8 were replaced. Under the plain language of MCR 2.511(G), once Juror No. 8 was dismissed for cause, upon selection of a replacement juror, the new juror would be subject to challenge, "as are previously seated jurors." However, the error does not require reversal as mandated by *Schmitz*.

Our Supreme Court, in *People v Bell*, 473 Mich 275; 702 NW2d 128 (2005), mod 474 Mich 1201 (2005), addressed whether a trial court's error regarding peremptory challenges could be deemed harmless. The pertinent facts in *Bell* were summarized in the lead opinion as follows:

-10-

Defendant is African-American and the two victims were Caucasian. During jury selection, defense counsel attempted to exercise a peremptory challenge to strike potential juror number ten, who is Caucasian. Juror ten stated during voir dire that three of his friends were high-ranking police officers, but that he "wouldn't think" that this fact would affect his ability to be fair and impartial. When defense counsel attempted to excuse this juror peremptorily, the trial court disallowed the challenge, concluding that counsel had exercised the challenge on the basis of race. The trial court initially refused to allow defense counsel to make a record, but reconsidered after defense counsel expressed dissatisfaction with the trial court's refusal. Defense counsel then furnished a race-conscious, rather than race-neutral, reason for the challenge and the trial court continued to disallow the challenge.

Jury selection continued. After several more defense peremptory challenges, the prosecutor objected when defense counsel attempted to excuse juror number five. The prosecutor claimed that defense counsel was attempting to strike juror five on the basis of race, contrary to *Batson* [*v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986)]. The trial court excused the jury in order to make a record regarding the challenge. The prosecutor noted that the current challenge was defense counsel's third consecutive strike on a Caucasian male and that defense counsel was attempting to exclude Caucasian males from the jury. Defense counsel replied that the prosecution's argument would have some merit if no other Caucasian males remained on the jury. Defense counsel also noted that the majority of the remaining jurors was [sic] Caucasian. Defense counsel offered no other explanation for his challenge. The trial court found defense counsel's explanation race-conscious and disallowed the challenge. Consequently, both jurors five and ten sat on the jury that convicted defendant. [*Bell*, 473 Mich at 279-280.]

A majority of justices in *Bell* held that the trial court did not err in finding purposeful discrimination because the defendant provided race-conscious reasons for exercising the peremptory challenge. *Id*. at 290, 300 (CORRIGAN, J., joined by YOUNG and MARKMAN, JJ.), 300-301 (WEAVER, J., concurring). The lead opinion further stated:

In light of our conclusion that the trial court's initial error was cured, we need not address whether a denial of a peremptory challenge is subject to automatic reversal. Had we concluded, however, as do our dissenting colleagues, that defendant's peremptory challenges had been improperly denied, we would have applied a harmless error standard to the error, because *People v Miller,* 411 Mich 321, 307 NW2d 335 (1981), and *People v Schmitz,* 231 Mich App 521, 586 NW2d 766 (1998), are no longer binding, in light of our current harmless error jurisprudence, to the extent that they hold that a violation of the right to a peremptory challenge requires automatic reversal.

We arrive at this conclusion by recognizing the distinction between a *Batson* error and a denial of a peremptory challenge. A *Batson* error occurs when a juror is actually dismissed on the basis of race or gender. It is undisputed that

-11-

this type of error is of constitutional dimension and is subject to automatic reversal. In contrast, a denial of a peremptory challenge on other grounds amounts to the denial of a statutory or court-rule-based right to exclude a certain number of jurors. An improper denial of such a peremptory challenge is not of constitutional dimension. [*Bell*, 473 Mich at 292-293 (CORRIGAN, J., joined by YOUNG and MARKMAN, JJ.) (citations omitted).]

In a separate opinion, Chief Justice Taylor "concur[red] with the lead opinion that the denial of a statutory peremptory challenge is subject to harmless error review and that *People v Schmitz*, 231 Mich App 521[,] . . . must be repudiated to the extent that it held to the contrary." *Bell*, 473 Mich at 302 (TAYLOR, C.J., concurring in part and dissenting in part). Thus, a majority of the Court in *Bell* agreed that the denial of a peremptory challenge may be harmless error.[3]

We conclude that the trial court's error here was harmless. The right to a peremptory challenge in Michigan is provided by statute and court rule and is of non-constitutional dimension. *Bell*, 473 Mich at 294-295, 302. Where, as in this case, the error is preserved, it is reviewed under the "more probable than not" standard set forth in *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). See *Bell*, 473 Mich at 294. Under that standard, reversal is not required unless "it is more probable than not that a different outcome would have resulted without the error." *Lukity*, 460 Mich at 495.

Andrews had previously passed on challenges for cause and peremptory challenges when the jury panel consisted of Juror No. 8 and 13 other jurors. After Juror No. 8 was excused, Andrews had the same jury panel, minus one, in which any of the remaining 13 could be excused as an alternate. Thus, the jury remained composed of members that Andrews's counsel had previously approved individually and as a group. Andrews's counsel expressed the concern at trial that a new incoming juror might affect the interaction "among all the jurors" and thereby "change[] the whole dynamics." That concern never materialized because Juror No. 8 was never replaced by a new juror. Although Andrews did not waive any error when he affirmatively approved the trial court's plan to hold trial with only one alternate juror, we believe that this approval, combined with the fact that the jury composition that Andrews's counsel had already approved was not changed by the addition of a new person, supports the conclusion that the error was harmless. That is, considering that Andrews willingly proceeded with an agreeable jury composed of one less alternate juror, and that Andrews was never presented with a situation where the dynamics of the jury were changed by a newly added juror, we agree that the trial court's error did not affect the outcome. Accordingly, Andrews is not entitled to relief based on this issue.

## B. PROSECUTORIAL MISCONDUCT

---

[3] Although plurality opinions where a majority of justices do not agree on the reasoning for a result are not binding precedent, *Negri v Slotkin*, 397 Mich 105, 109; 244 NW2d 98 (1976), a ground for decision to which a majority of the Court agrees, is binding precedent, *People v Tanner*, 496 Mich 199, 214 n 6; 853 NW2d 653 (2014).

Andrews argues that a new trial is required because the prosecutor improperly discussed "civic duty" in her closing argument. Because Andrews did not object to the prosecutor's argument at trial, this issue is unpreserved, and our review is limited to plain error affecting Andrews's substantial rights. *Bennett*, 290 Mich App at 475.

As stated earlier when addressing Harris's appeal, "it is improper for a prosecutor to appeal to the jury's civic duty by injecting issues broader than guilt or innocence or encouraging jurors to suspend their powers of judgment." *Thomas*, 260 Mich App at 455-456. Viewed in context, the prosecutor's arguments did not inject issues broader than Andrews's guilt or innocence, and she was not encouraging the jurors to suspend their powers of judgment and convict him regardless of the evidence. She argued that Johnson's testimony was credible because he consistently described what he saw. She argued that Johnson did not know Andrews or know that Andrews was Harris's cousin, but he identified Andrews in the photographic lineup, which was an unlikely coincidence if he did not recognize Andrews from the incident. She also argued that Andrews's statements in recorded telephone calls after hearing Johnson's testimony at the preliminary examination indicated that Andrews was conscious of his own guilt and realized that Johnson's testimony would likely result in his conviction. The prosecutor's comments that a guilty verdict would provide justice and closure for the family and that it would vindicate Johnson's cooperation with the police and the prosecutor were integrated into arguments based on the evidence. Therefore, they did not rise to the level of improper civic duty arguments. See *Lane*, 308 Mich App at 66. Accordingly, there was no plain error.

Because the prosecutor's arguments were not improper, there is no basis for Andrews's related ineffective assistance of counsel argument, so it also cannot succeed. Counsel is not ineffective for failing to assert a futile objection. *Unger*, 278 Mich App at 256.

We affirm in both appeals.

/s/ Peter D. O'Connell
/s/ Jane E. Markey
/s/ Colleen A. O'Brien